Ollie Melvin **HODGES**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 19029.

United States Court of Appeals
Eighth Circuit.

March 11, 1969.

James E. Lyons, Legal Aid and Defender Society of Greater Kansas City, Kansas City, Mo., for appellant, Paul T. Miller, Kansas City, Mo., on the brief.

Paul A. White, Asst. U. S. Atty., Kansas City, Mo., for appellee, Calvin K. Hamilton, U. S. Atty., and Anthony P. Nugent, Jr., Asst. U. S. Atty., Kansas City, Mo., on the brief.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

BLACKMUN, Circuit Judge.

Ollie Melvin Hodges, born in 1900, after pleas of not guilty, was convicted by a jury on each of three counts of an indictment charging him with violations of the counterfeit-utterance statute, 18 U.S.C. § 472.[1] Specifically, the indictment charged Hodges with passing, uttering, publishing, and selling, knowingly and with intent to defraud, counterfeit $10 Federal Reserve notes at two hotels and a shoe store in Kansas City, Missouri, on or about January 13, 1966. Judge Duncan imposed a sentence of 3 years on each count, with the sentences all to run concurrently. Hodges appeals in forma pauperis.

The points raised on appeal are: (A) that Hodges was denied his constitutional right "to a speedy * * * trial"; (B) that he was prejudiced by an Allen instruction; and (C) that Chief Judge Becker applied an erroneous standard at a pre-trial competency hearing when he determined that the defendant was competent to stand trial.

No point is raised about the sufficiency of the evidence and there is now no real dispute as to the facts. It is fair to say, we feel, that the factual controversy at the trial centered not so much on Hodges' passing of the bills as on his intent at the time of their passing.

In view of the presence of the speedy trial issue, we outline the chronological

---

1. "§ 472. Uttering counterfeit obligations or securities

"Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell * * * any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

development of the case as it appears in the record:

1. On January 27, 1966, Hodges was arrested in Omaha. He was not able to furnish bail.

2. The next day Hodges was removed to the Western District of Missouri. The indictment was returned there on February 11, 1966. The district court forthwith appointed J. Whitfield Moody and another, both of the Legal Aid and Defender Society, Kansas City, Missouri, as defense counsel.

3. Hodges appeared with court-appointed counsel for arraignment before Judge Becker on February 21. A plea of not guilty to each count was entered. At the inception of this proceeding counsel asked whether Hodges might sit down because he "has had a stroke." Hodges said he suffered his third stroke in 1964 and had been under doctor's care since February of that year. The court inquired as to whether the defendant could make bail or be released on his own recognizance and as to his medical needs. After some discussion in open court, the Assistant United States Attorney orally moved that the defendant be committed for psychiatric examination. Defense counsel and, upon direct inquiry, Hodges himself stated that there was no objection to this. The court, pursuant to 18 U.S.C. § 4244, then issued its order committing the defendant to the United States Medical Center at Springfield, Missouri, for a period not to exceed 90 days, for psychiatric examination and evaluation to determine his competency to stand trial and also his competency at the time of the alleged offenses. Hodges was taken to Springfield on February 26. He was returned 88 days later on May 25.

4. The competency hearing took place on June 30 and July 1, 1966. Judge Becker preliminarily observed that the Medical Center report stated that the predominant opinion was that Hodges was not mentally competent to assist in his defense.[2] The court said, however, that it would proceed with a hearing on that issue [as, indeed, is required by § 4244]. At the hearing the government called Dr. Arthur Hildreth, then a staff psychiatrist at the Medical Center. The defense placed Hodges on the stand. At the conclusion of the testimony defense counsel stated to the court that it was Hodges' desire to proceed and that "it would be an injustice in this particular case to find him incompetent." Judge Becker observed that he had the impression "that the defendant has recently had a remarkable recovery both from physical illness as well as mental impairment." Then, despite Doctor Hildreth's contrary testimony, the court found the defendant competent to stand trial. It expressly made no finding as to competency at the time of the alleged offenses. It also indicated that, if the defendant's condition deteriorated, another hearing might be required. The case was adjourned "till further order".

5. Three and a half months later, on October 19, 1966, the court issued its written order setting Hodges' case for jury trial to begin November 1.

6. On October 27 the court issued its order reciting "a conflict in the schedule of trials by the Assistant United States Attorney handling this cause and for good cause shown" and postponing the trial until "further order of Court".

7. On the same date the court ordered Hodges released on a $1000 personal recognizance bond with permission to "return to his residence at Omaha, Nebraska".

8. On February 21, 1967, the court issued a notice of the setting of six criminal cases for jury trial, the first to be-

2. The staff report of May 19, 1966, recites, "At the end of the second staffing, there was still some disagreement as to his competency to stand trial, four physicians feeling that Mr. Hodges was not competent and two physicians feeling that he was competent." On the question of responsibility at the time of the offenses, the Springfield staff was also divided, three physicians feeling he was probably responsible, one that he was probably not, and two that it was impossible to come to a decision.

gin March 20. Hodges' case headed the list.

9. On March 1 the court issued an amended notice setting five cases for jury trial, the first to begin March 20. Hodges' case was second on that list.

10. On March 14 the court, for "good cause appearing", issued its order resetting cases theretofore set for the week of March 20 over to the week of April 3. Hodges' case was second on that list.

11. On March 31 the court, again for "good cause appearing", issued its order postponing "until further notice" the last five cases theretofore set for trial the week of April 3. Hodges' case was first on that list.

12. On June 23, 1967, an order signed by the four active judges of the Western District of Missouri transferred 12 criminal cases to the docket of Senior Judge Duncan. Hodges' case was first on that list.

13. Hodges went to trial before Judge Duncan on Monday, July 17, 1967.

14. On July 17, prior to the impanelling of the jury, the defense orally raised the speedy trial issue. On July 18, during trial, the defense submitted its written motion to dismiss the indictment on the ground that the several continuances were not at the request of the defendant and were without his consent and that the delay of some 17 months in bringing the defendant to trial was unnecessary; that there were other defendants indicted after Hodges and tried before he was; and that the delay violated his right to a speedy trial under the Sixth Amendment and was a denial of due process under the Fifth Amendment in that the defendant had been hampered in his evidence to locate and subpoena necessary witnesses.

15. Judge Duncan heard argument on the motion in chambers on July 19. Defense counsel stated that Hodges "was familiar with certain people in and about Kansas City"; that the testimony of persons with Hodges at the time he made purchases and passed the bills would be important on the issue of whether he knew the money was bad; and that Hodges, because of prior convictions, was handicapped in taking the stand and was further handicapped because of his strokes and inability to express himself. Upon inquiry by the court, counsel conceded that the defense had filed no motion at any time asking that the case be expedited. The prosecution stated that after Hodges came back from Springfield "it was determined he was in bad physical condition and he was sent by the Marshal up to Leavenworth to the hospital". Judge Duncan observed that no evidence which may have been denied to the defense would "throw any' light upon the case as it has been produced up to this time"; that the one named person said to have been in Hodges' company when the money passed had been in the Philippines for a year and "her testimony could not possibly throw any light on the question of whether or not these bills that were passed were counterfeit bills"; that there was no suggestion as to what that witness would testify to; and that no application for continuance had been filed on the ground that the witness was not present. The court, accordingly, denied the motion to dismiss.

16. The verdict was returned on Friday morning July 21.

A. *The speedy trial issue.* The foregoing chronology demonstrates that:

1. There was less than a month between the date of the alleged offenses and the indictment.

2. As far back as the arraignment on February 21, 1966, Judge Becker inquired as to the possibility of Hodges' release on his own recognizance.

3. Although Hodges, continuously from the very date of the indictment's return, February 11, 1966, had counsel representing him, albeit court-appointed counsel, no motion, formal or informal, was ever made by the defense to suggest speedy trial concern until the case was called for trial.

4. On the other hand, Hodges himself expressed a desire for no delay. When he was on the stand at the competency

hearing on June 30, 1966, after Springfield and a full year before trial, the following question by his counsel and Hodges' answer to it came forth:

"Q. Is it your desire to have an immediate trial of the charges of which you stand accused?

"A. Yes, sir, I do."

5. The time between arrest and indictment was 15 days. The time between indictment and trial was 17 months and 6 days. However, 88 days of this, or approximately 3 months, was the period of Hodges' commitment to Springfield.

6. Not one of the successive trial continuances was at the request of the defense. Apparently only one, the first, was at the request of the prosecution.

7. Hodges was incarcerated from the time of his arrest at Omaha on January 27, 1966, until his release on his personal recognizance about October 28, a pretrial period of 9 months. Again, 88 days of this were at Springfield. But he was in jail or prison for 5 months after his return from the Medical Center.

8. Hodges was free, however, from late October 1966 until the time of trial in mid-July 1967, a period of approximately 8½ months. Eliminating the Springfield time, his period of pre-trial freedom exceeded that of his pre-trial confinement. We were advised at oral argument that Hodges has been at large since the trial.

Certain obvious and preliminary conclusions are readily drawn:

■ 1. The indictment was promptly returned. The month between the claimed offenses and the formal charge is not an unreasonable delay and by itself is no part of any denial of the right to a speedy trial.

■ 2. With Hodges' competency appropriately in question, any deferment of the trial for the 88-day Springfield period is no part of an unreasonable delay. ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Speedy Trial, § 2.3(a) and (c) (1967). The examination and evaluation pursuant to § 4244 served as much for the defendant's protection as for the government's. And defense counsel, and Hodges himself, joined in the suggestion that he go to Springfield.

■ 3. The one request by government counsel for trial deferment because of schedule conflict was not in itself fatal. Although the record is not informative, we do not assume that the request was for an unduly long period.

4. The status of the criminal calendar in the Western District of Missouri was of concern to the district judges there. This is evidenced by the fact that each of the active judges joined in the assignment order transferring cases, including Hodges', to Judge Duncan. Once this transfer was effected, Judge Duncan promptly devoted his attention to Hodges' case.

We turn to the basic issue.

■ The right to a speedy trial when one is accused of crime, federal or state, is, of course, one of our most fundamental and treasured rights. Klopfer v. North Carolina, 386 U.S. 213, 223–226, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). In addition to its Sixth Amendment stature, the right is implemented by Criminal Rule 48(b)[3] and by the requirement of Criminal Rule 50 that "[p]reference shall be given to criminal proceedings as far as practicable." Pollard v. United States, 352 U.S. 354, 361 n. 7, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). The cases recognize that the Sixth Amendment guarantee and a defendant's right under Rule 48(b) are not

---

3.    "Rule 48
      "DISMISSAL
   *    *    *    *    *
   "(b) By Court. If there is unnecessary delay in presenting the charge to a grand jury or in filing an information

against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."

coextensive. Mathies v. United States, 126 U.S.App.D.C. 98, 374 F.2d 312, 314–315 (1967); Cohen v. United States, 366 F.2d 363, 367 (9 Cir. 1966), cert. denied, 385 U.S. 1035, 87 S.Ct. 771, 17 L.Ed.2d 682; Mann v. United States, 304 F.2d 394, 397–398 (D.C.Cir.1962), cert. denied, 371 U.S. 896, 83 S.Ct. 194, 9 L.Ed. 2d 127; 8A Moore's Federal Practice, para. 48.03 [1] (1968). Although the motion to dismiss here appears to rest on the constitutional ground, its prayer for relief also refers to Rule 48(b). We therefore consider the motion as based both on the Sixth Amendment and on the Rule.

1. *The constitutional guarantee.* We take as a starting point the majority opinion in United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), the content of which has just been generally reaffirmed in Smith v. Hooey, supra. That case presented the fact situation, with respect to each of two defendants, of an indictment; conviction upon a plea of guilty; sentence; vacation of the conviction because of an intervening decision of the controlling appellate court in an unrelated case; a new complaint; rearrest; and a second indictment. The Supreme Court, on the government's appeal, reversed the district court's dismissal of the new indictment on Sixth Amendment grounds. It held, 383 U.S. at 120, 86 S.Ct. at 776: (1) "We cannot agree that the passage of 19 months between the original arrests and the hearings on the later indictments itself demonstrates a violation of the Sixth Amendment's guarantee of a speedy trial." (2) The guarantee "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." (3) However, "the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." (4) Then, quoting from earlier cases, "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." "Whether delay in completing a prosecution * * * amounts to an unconstitutional deprivation of rights depends upon the circumstances. * * * The delay must not be purposeful or oppressive." "[T]he essential ingredient is orderly expedition and not mere speed."

In addition, the Court observed, 383 U.S. at 122, 86 S.Ct. at 777, first, that the new indictments "were brought well within the applicable statute of limitations, which is usually considered the primary guarantee against bringing overly stale criminal charges," and, second, that the defendants' claim "of possible prejudice in defending themselves is insubstantial, speculative and premature. They mention no specific evidence which has actually disappeared or has been lost, no witnesses who are known to have disappeared."

Mr. Justice Brennan's concurrence in the result, 383 U.S. p. 125, 86 S.Ct. p. 779, and the dissent of Mr. Justice Fortas joined by Mr. Justice Douglas, 383 U.S. p. 126, 86 S.Ct. p. 779, did not rest on Sixth Amendment grounds. Indeed, the dissenters agreed that there was no violation of the Sixth Amendment's right to a speedy trial.

The *Ewell* guidelines lead us to resolve the Sixth Amendment issue against the defense:

██ a. We begin by paraphrasing here what the Supreme Court said there, namely, the passage of something less than 18 months between Hodges' arrest and his trial does not of itself demonstrate a violation of the Sixth Amendment's guarantee of a speedy trial.

██ b. The first safeguard, "to prevent undue and oppressive incarceration prior to trial", translates, on the facts here, to a total of 6 months pre-trial incarceration, apart from the 88 days of

commitment at Springfield. We confess that we are uncomfortable about the 4 months incarceration after the competency hearing was concluded on July 1, 1966. Four months, by themselves, are probably seldom constitutionally offensive; many rural court terms do not come about that frequently. At least, under the circumstances here, we conclude that the 4 months were not "undue and oppressive incarceration prior to trial". Hodges' questionable competency until the hearing concluded on July 1, the lack of any positive move for relief on the part of the defense, and the absence of any showing of oppression, other than that inherent in imprisonment, are pertinent and persuasive factors. We might mention that in his testimony Hodges spoke of no wife, that is, any present one, or established home and indicated only a rooming arrangement for his abode in Omaha or Kansas City.

■ c. The second safeguard, "to minimize anxiety and concern accompanying public accusation", encounters nothing of substance in this record. There is no evidence of anxiety or of concern on Hodges' part about the effect of the accusation against him in the public view. Some of this, too, is inherent. But Hodges was not employed. He had had many prior difficulties with the law. He voiced no concern about his reputation. He professed to have many children but had no family relationship with them and could not remember their names.

■ d. The third safeguard, "to limit the possibilities that long delay will impair the ability of an accused to defend himself", is most important. But, here again, we perceive nothing of consequence. The only suggestion is that persons accompanying Hodges when he made purchases at the shoe store [the third count] were no longer available to testify. Specificity is provided, however, only by reference to a woman named Charlie May Turner who was the mother of one of Hodges' children and who was said to have moved with her husband from Kansas City to the Philippines after Hodges' indictment and before trial. We have no reason to differ with Judge Duncan's observations that anything Mrs. Turner could offer was irrelevant on the issue of Hodges' knowledge at the time of utterance of the shoestore bills. Furthermore, she was not present at the time of the passage of the hotel bills which are the subject of two of the indictment's three counts. Hodges took the stand himself at trial and denied guilty knowledge. Possible witness Charlie at most could add nothing more than cumulative material.

e. We note, also as the Supreme Court in *Ewell* did, that Hodges' trial took place 18 months after the utterance of the bills, a point in time well within even the first half of the 5-year period of the applicable statute of limitations. 18 U.S.C. § 3282. Of course the presence of this statute does not mean that the government may blissfully defer a prosecution until shortly before the expiration of the 5-year period and still be assured that it will not be confronted with a Sixth Amendment challenge. The delay "must not be purposeful or oppressive." Pollard v. United States, supra, 352 U.S. at 361, 77 S.Ct. at 486.

■ f. Here, too, as in *Ewell*, the defense claim of "possible prejudice in defending * * * is insubstantial, speculative and premature". There is no mention of "specific evidence which has actually disappeared or has been lost, no witnesses who are known to have disappeared", other than the suggestion about Charlie May Turner.

■ g. Finally, we are again reminded by *Ewell* that the speedy trial right is "necessarily relative" and that orderly expedition and not mere speed is the essential ingredient. This is reminiscent of the phrase "with all deliberate speed" applied to the integration cases. Brown v. Board of Education, 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Taking into account all the aspects of Hodges' case, his questioned competency; the accepted pre-trial com-

mitment to Springfield; the absence of demonstrated prejudice in the economic, family, public esteem, and health areas, or as to the availability of evidence and witnesses; the promptness in the holding of the competency hearing after the return from Springfield; his 8½ month continuous pre-trial freedom from late October to the time of trial; and the absence of positive request by competent defense counsel for an expedition of the trial, we conclude overall that Hodges has not been denied his Sixth Amendment right to a speedy trial. See Von Feldt v. United States, 407 F.2d 95 (8 Cir. 1969); Barnes v. United States, 347 F.2d 925, 930–931 (8 Cir. 1965); Mack v. United States, 326 F.2d 481, 486–487 (8 Cir. 1964), cert. denied, 377 U.S. 947, 84 S.Ct. 1355, 12 L.Ed.2d 309; Wilkins v. United States, 395 F.2d 620 (D.C.Cir. 1968).

■■■ 2. *Criminal Rule 48(b).* If we focus on Rule 48(b), rather than on the Sixth Amendment, our standard then is whether Judge Duncan's refusal to dismiss the indictment was an abuse of discretion. Terlikowski v. United States, 379 F.2d 501, 504 (8 Cir. 1967), cert. denied, 389 U.S. 1008, 88 S.Ct. 569, 19 L. Ed.2d 604; Foley v. United States, 290 F.2d 562, 566 (8 Cir. 1961), cert. denied, 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed.2d 88. Most of the factors discussed above with respect to the Sixth Amendment are equally pertinent and applicable here. Of particular import, however, on the discretionary aspect, is the fact that, aside from Hodges' answer to the question at the competency hearing, and counsel's reference to that question and answer, there was no demand to expedite the trial. The absence of any demand has been noted frequently and emphasized by this court. Frankel v. Woodrough, 7 F. 2d 796, 798 (8 Cir. 1925); Collins v. United States, 20 F.2d 574, 576–577 (8 Cir. 1927); Bayless v. United States, 147 F.2d 169, 170 (8 Cir. 1945), defendant's conviction reversed on other grounds in supplemental opinion 150 F.2d 236 (8 Cir. 1945); Davidson v. United States, 312 F.2d 163, 167 (8 Cir. 1963).

See Mathies v. United States, supra, 374 F.2d at 315. We find no abuse of discretion under Rule 48(b) in the court's action.

Our ruling on the Sixth Amendment and Rule 48(b) issue is thus adverse to the defendant. Nevertheless, because the factual situation concerns us and because we feel it reveals the possible presence of danger and embarrassment, we presume to say, by way of caveat:

■■■ 1. The government and, for that matter, the trial court are not without responsibility for the expeditious trial of criminal cases. The burden for trial promptness is not solely upon the defense. The right to "a speedy * * trial" is constitutionally guaranteed and, as such, is not to be honored only for the vigilant and the knowledgeable. The United States Attorney has a duty to press criminal cases to trial, to give them any necessary priority, and to prevent, whenever possible, even the suggestion of staleness. See Pitts v. North Carolina, 395 F.2d 182, 185–186 (4 Cir. 1968). And the trial court, which is the neutral arbiter for the defense as well as for the prosecution, must do all it can to keep its criminal dockets current. United States v. Mann, 291 F.Supp. 268 (S.D. N.Y.1968). The court here most appropriately made inquiry as to this as far back as February 21, 1966. But a staleness suggestion, which has any justification for its utterance, reflects on the court itself and on the administration of federal justice. See ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Speedy Trial, § 1.2 (1967).

■■■ 2. Where a multiple-judge court uses the individual calendar system, all judges must share responsibility for the prompt disposition of criminal cases, must employ a team approach to those cases, and, when necessary, must reassign them in order that they may be tried according to the commands of the Sixth Amendment and Criminal Rules 48(b) and 50. If a judge is otherwise long committed in another case or is

delayed in getting to the criminal cases on his calendar by reason of illness, personal misfortune or press of other business, this obviously does not serve to toll the enforcement of the right of a defendant awaiting trial on that judge's criminal calendar.

3. A defendant's waiver of his right to a speedy trial is not, in this day, readily to be assumed. Of course, waiver of that right is possible but mere inaction is not always automatically to be regarded as equating with waiver. See ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Speedy Trial, § 2.2, which refers to time running "without demand by the defendant."

4. Trial schedule conflicts for the court, for defense counsel, and for government counsel will inevitably arise. This is common in a busy judge's life and in that of heavily occupied counsel. An occasional trial deferment for a reasonable time because of a conflict may not offend the Sixth Amendment and the Rules. But the possibility of offense exists and increases as trial deferment multiplies and lengthens. The court and counsel on both sides must do their best to prevent delay.

B. *The Allen charge.* The Supreme Court in Allen v. United States, 164 U.S. 492, 501–502, 17 S.Ct. 154, 41 L.Ed. 528 (1896), held nonprejudicial a supplemental charge given a jury when it had returned "apparently for further instructions". The charge itself is not reproduced in the Court's opinion but it is described there as one which spoke of the unexpectability of absolute certainty, candor, regard and deference for the opinions of others, the jury's duty to decide the case if they conscientiously could do so, and a juror's need to consider, when a majority is inclined the other way, whether his judgment might be incorrect. This approach appears to have been adhered to in Lias v. United States, 284 U.S. 584, 52 S.Ct. 128, 76 L.Ed. 505 (1931), affirming 51 F.2d 215, 218 (4 Cir. 1931), and in Kawakita v. United States, 343 U.S. 717, 744, 72 S.Ct. 950, 966, 96 L.Ed. 1249 (1952), affirming 190 F.2d 506, 521–528 (9 Cir. 1951), where the Court referred to "[o]ther alleged errors" as "either insubstantial or so adequately disposed of by the Court of Appeals that we give them no notice * * *." But in Jenkins v. United States, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965), the Court, upon the acquiescence of the Solicitor General, concluded that the trial judge's statement, "You have got to reach a decision in this case", was coercive. Then, in Kent v. United States, 383 U.S. 541, 552 n. 13, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the Court found it not necessary to pass upon a version of the Allen charge.

The defense asserts that the charge as given here went prejudicially beyond the Allen charge; that, moreover, the use of the pure Allen charge is inherently coercive; and that the Allen charge, as well as the one used here, violates the Sixth Amendment's guarantee of a trial "by an impartial jury".

We initially reject the claim that the Allen charge itself must be held today, some 70 years after the decision, to be coercive, prejudicial, and unconstitutional. The Supreme Court has not yet seen fit to disavow it and, so long at it stands approved in decided Supreme Court cases, we are not to resolve that issue contrarily.

Attack upon charges of the Allen type, however, are increasingly frequent. This court has encountered them. In a number of cases the challenged instruction has been upheld. Examples are Bowen v. United States, 153 F.2d 747, 751 (8 Cir. 1946), cert. denied, 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611; Costello v. United States, 255 F.2d 389, 398 (8 Cir. 1958), cert. denied, 358 U.S. 830, 79 S.Ct. 51, 3 L.Ed.2d 69; Janko v. United States, 281 F.2d 156, 167–168, and cases cited in n. 17 (8 Cir. 1960), rev'd on other grounds, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846; Holdridge v. United States, 282 F.2d 302, 311 (8 Cir. 1960). In others, particularly where numbers are made evident, the instruction has

been held to be prejudicial. Examples are Stewart v. United States, 300 F. 769, 782–787 (8 Cir. 1924) ; Nigro v. United States, 4 F.2d 781, 785 (8 Cir. 1925) ; Jacobs v. United States, 279 F.2d 826, 827–832 (8 Cir. 1960). Along this line, see Burton v. United States, 196 U.S. 283, 304–308, 25 S.Ct. 243, 49 L.Ed. 482 (1905), and Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926).

The Sixth Circuit recently noted that the Allen charge "as such" has been approved by all the circuits "with varying degrees of reluctance," and stated that the charge "approaches the limits beyond which a trial court should not venture in urging a jury to reach a verdict." United States v. Harris, 391 F.2d 348, 354 (6 Cir. 1968), cert. denied, 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d 145.

Other circuits have been critical of charges of this type and have similarly concluded that the Allen charge itself represents the permissible limit of verdict-urging instructions. Green v. United States, 309 F.2d 852, 854 (5 Cir. 1962) and United States v. Rogers, 289 F.2d 433, 435–437 (4 Cir. 1961), are examples. But the essentially pure Allen charge continues to be upheld. United States v. Harris, supra, 391 F.2d at 354; United States v. Kahaner, 317 F.2d 459, 484–485 (2 Cir. 1963), cert. denied, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed.2d 65; Fulwood v. United States, 125 U.S.App.D.C. 183, 369 F.2d 960 (1966), cert. denied, 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996.

A review of the supplemental charge employed by Judge Duncan[4] and the

4. "Gentlemen, I want to talk to you about it a little. You should consider that the case must sometime be decided, and that you are selected in the same manner as other juries. Failure to agree upon a verdict will necessitate another trial equally as long and as expensive.

"The Court is of the opinion that the case cannot again be tried in a better or more exhaustive manner. It is therefore very desirable that you should return a verdict. The only manner provided by our Constitution and laws for deciding questions of fact is by a verdict of a jury.

"In a large proportion of cases and perhaps strictly speaking in all cases, absolute certainty cannot be attained and is not expected, although the verdict to which a juror agrees must of course be his own verdict, as a result of his own conviction and not a mere acquiescence in the conclusion of his fellow jurors. Yet in order to bring 12 minds to a unanimous verdict, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinion of others. You should consider that the case, as I said, must be decided in some manner, and that you are selected in the same manner from the same source which any future jury will be selected.

"There is no reason to suppose that the case will ever be submitted to 12 more intelligent or more competent jurors for decision, or that more or clearer evidence will be produced on one side or the other.

"It is your duty to decide the case if you can conscientiously do so. In conferring together you ought to pay proper respect to each other's opinions. You should listen with disposition to be convinced to each other's arguments. If, on one hand, a majority of your panel are for the plaintiff, a dissenting juror should consider whether a doubt in his mind is a reasonable doubt. If this doubt has made no impression upon the minds of the majority of the panel equally honest and intelligent with himself, you have heard the same evidence with the same attention with an equal desire to arrive at the truth under the sanctions of the same oath, he should carefully consider the reasonableness of that doubt.

"If, on the other hand, a majority is for the defendant, the minority ought seriously to ask themselves whether they might not reasonably doubt the correctness of the conclusions which is not concurred in by the majority of those with whom they are associated.

"A majority should seriously question the weight and sufficiency of the evidence upon which their doubt is based when it fails to carry conviction to the minds of their fellow jurors.

"Now, as I say, members of the jury, I do not mean to attempt to influence you one way or the other, but there is no other way to try these cases, and if you do not agree upon a verdict, some other jury will have to be brought back and go over the same facts again, and if you can arrive at a verdict consistent with your oath and your feelings, your obliga-

circumstances under which it was delivered convince us that the point, as here raised, is without merit.

This jury retired at 5:07 p.m. on July 19. At 6:10 p.m. they concluded their deliberations for the day. They came back the next morning at 9:30. At noon they reported that they were making little progress. They were excused for lunch until 1 p.m. When they returned, Judge Duncan gave them his supplemental instruction. The jury again retired at 1:15 p.m. The defense voiced its objection to the additional charge. At 5:45 p.m. the jury reported that they had not been able to agree on a verdict but felt they might so do "in a few hours more". The jury was excused for the night. They returned at 9:30 a.m. on July 21. At 10:45 a.m. the verdicts of guilty were returned.

The jury thus deliberated 1 hour late Wednesday afternoon, 2½ hours Thursday morning, and, after the supplemental instruction, 4½ hours Thursday afternoon, and an hour and 15 minutes Friday morning. It conferred a total of 9¼ hours. Of this time, 5¾ hours were consumed after the additional charge was delivered.

■ This is not a case, as some have been, where the jury returned its verdict promptly following the supplemental instruction and where a coercive effect is therefore strongly suggested. See United States v. Rogers, supra, 289 F.2d at 434–35. Here the jury continued its deliberations for a full half day and part of the next morning. There was no hint as to division. Of course, one may argue that, technically, it is not correct for the court to say that "the case must sometime be decided" or that "some other jury will have to be brought back", see United States v. Harris, supra, 391 F.2d at 355, rather than "disposed of sometime", see W. Mathes and E. Devitt, Federal Jury Practice and Instructions, § 15.16 (1965). Further, a reference to the expense of trial is not everywhere

approved. See United States v. Smith, 303 F.2d 341, 343 (4 Cir. 1962). We feel, however, that the references of this kind which were employed here are, realistically, of small consequence. It is obvious to a jury that a lawsuit is costly and time consuming. It is also obvious to a jury that, if it is unable to arrive at a verdict, the case does not fade away but remains for decision or other disposition. Judge Burger in Fulwood v. United States, supra, 369 F.2d at 963, most pertinently observed:

"The statement that some other jury would have to decide the case if this one could not was accurate as a generality and, in any event, could have had no coercive impact on the jury. If they already knew what would likely happen if they deadlocked, it was surplusage; if they did not know, this information, far from being coercive, would have had the effect of reducing the pressure on them to reach a verdict."

See also Thaggard v. United States, 354 F.2d 735, 738–739 (5 Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301, and United States v. White, 382 F.2d 445, 447 (7 Cir. 1967), cert. denied, 389 U.S. 1052, 88 S.Ct. 796, 19 L.Ed.2d 846.

■ We have studied Judge Duncan's supplemental charge in its entirety. His careful warning against influence by the court, and the fact of this jury's continued deliberation thereafter for more than 5 hours over 2 calendar days, dispel, in our minds, any suggestion of coercion.

C. *The mental competency standards.* The defense argument here is that, in determining the issue of Hodges' mental competency to stand trial, Judge Becker failed to comply with the standards enunciated in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), namely, that orientation to time and place and some recollection of events are not enough and that it must be de-

---

tions to yourself, every possible effort should be made to do so.

"So you will be excused and now return to your jury room."

termined whether the subject has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." It is claimed that the court's only finding related to orientation as to time and place and as to recollection of past events.

We hold otherwise. Judge Becker's findings met the Dusky standards in every respect. He found that Hodges was presently competent to be tried, to understand the nature of the proceedings against him, and to assist counsel in his defense. He was careful to recognize that this was a situation which might not be stable and that there was room for a reasonable difference of opinion at the time of the staff meeting at Springfield but that "the picture has changed since that time." The Springfield staff was not unanimous in its suggestion of incompetency. And a reading of Hodges' testimony at the competency hearing convinces us of the rightness of the court's conclusion. Hodges related to the court in detail his movements since he had first appeared in the courtroom several months before. He described his experience and his assignments at Springfield. He gave evidence of his ability to recall past events and of his orientation as to time and place. He knew what the charge against him was, what counterfeit bills were, what "passing" meant, that he was under federal prosecution and not a state charge, and what the respective functions of the prosecutor, the jury, and the judge were. He knew he was charged with a felony and he accurately described what a felony was. He knew how many people were on a jury and what they are to do. He indicated an awareness of his attorney's function and he acknowledged that he was able to confer with and aid his counsel. He stated that he felt he was capable of being tried and presenting all defenses he possessed. Actually, as has been pointed out above, all this tied in with his expression that he would like a prompt trial and that he was ready for it. That there was no medical evidence presented in person contrary to that of Doctor Hildreth is not fatal to the court's finding. After all, the Springfield report was not unanimous. Further, expert opinion on competency rises no higher than the reasons on which it is based and it is not binding upon the trier of facts. Feguer v. United States, 302 F.2d 214, 236 (8 Cir. 1962), cert. denied 371 U.S. 872, 83 S.Ct. 123, 9 L. Ed.2d 110.

Affirmed.