**UNITED STATES of America,**
**Plaintiff,**

v.

**131.76 ACRES OF LAND MORE OR LESS, Situate IN BENTON COUNTY, MISSOURI; and Dessie House, et al., Defendants.**

**No. 1307.**

United States District Court
W. D. Missouri, C. D.

March 20, 1969.

Calvin K. Hamilton, U. S. Atty., Patrick K. Monahan, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

Stanford M. Katz, Kansas City, Mo., for defendants.

**MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW**

JOHN W. OLIVER, District Judge.

I.

This is a jury-waived condemnation case. The government condemned fifty of a sixty acre tract of land in Benton County, Missouri, for the Kaysinger Dam project. Defendants purchased the subject unit in 1959 in contemplation of

retirement. The date of taking is March 21, 1968. The government's initial deposit in the amount of $2,330.00 was paid pursuant to an order entered by Chief Judge Becker on March 28, 1968.

After this action was re-transferred to the Central Division of this Court, it was set for trial on the next regular trial docket in Jefferson City. Additional evidence, for reasons to be stated, was adduced at a later hearing in Kansas City.

The testimony of the government's only appraisal witness was received at the hearing in Jefferson City on October 22, 1968. It became apparent during the course of that witness' testimony that he did not commence work on his appraisal until October 14, 1968, some eight days before the case was tried (Tr. 47). That witness testified that he had made his appraisal in accordance with instructions given him by the Corps of Engineers in Washington, D.C. (Tr. 42–43). It requires but a glance at those instructions, contained in Department of the Army Regulation No. 405–1–300 (Court Exhibit 1, Tr. 64) to understand that, so far as this case is concerned, the government's appraisal witness had not complied with that regulation.

Paragraph 3 (f) of the Regulation entitled *Policies and Standards* states:

*Evidence in Legal Proceedings.* The appraiser must bear in mind that he may be called upon, in condemnation proceedings or otherwise, to establish the validity and competence of his estimates. He must, therefore, familiarize himself with and be guided by basic rules of trial evidence so that his testimony will be admissible and of probative value. Since, as a witness, he must be prepared to offer convincing testimony, his report should contain an analysis of all factual data upon which his estimates are based.

Assuming, but without deciding, that someone other than the Department of Justice and the United States Attorney's office should instruct the expert witnesses who appear in condemnation cases, the principle stated in Paragraph 3 (f) of the regulation is consistent with the familiar and controlling rule recently applied in Hodges v. United States (8th Cir. 1969), 408 F.2d 543, decided March 11, 1969 that "expert opinion * * * rises no higher than the reasons on which it is based."

Paragraph 3 (i) of the regulation contemplates that the government's appraiser "during the course of his personal inspection of a property being appraised * * * is expected to see and talk personally to the owner or, in the owner's absence, his agent or representative." Paragraph 4 (c) states that "the proper approach to an appraisal problem is generally determined by the type, character and most proper use to which the property is adaptable. * * *" Paragraph 7 (c) requires that, if the comparative method of sales is used, "this process contemplates the compilation and analysis of all evidences of value with recent actual sales of similar properties a predominating comparative influence where all the terms, circumstances, and conditions under which such transfers were made are known to the appraiser by verification from the buyer and the seller and preferably both whenever possible." As will be apparent from our findings, the government's appraisal witness failed to comply with those instructions in this case.

Paragraph 31 of the regulation states that no real estate appraisal report would be considered acceptable to the government without an appropriate certification by the appraiser. No certified report of any government appraisal was offered in evidence. Indeed, the government appraiser on whose judgment the $2,330.00 deposit was apparently made was not called by the government nor was his name revealed during the trial.

Paragraph 5 of the regulation appropriately states that:

The importance of sound appraisals for the Department of the Army cannot be over-emphasized not only because the courts have established basic rules governing exercise of the power of eminent domain, but because of the governmental obligation to serve the general public and to protect the common welfare in such manner as to meet the acid test of severe criticism of methods employed in estimating compensation for the taking of private property for public use.

 That principle is equally applicable to small tracts as to large. The explicit principles of the Fifth Amendment require that no tract of land, however small, be taken for public use without just compensation. Due process commands that the standards governing the exercise of the power of eminent domain be applied in the same manner in all cases regardless of the amount of money involved in a particular case.

It became apparent during the government's appraisal witness' testimony that he had not talked to the purchaser in sale B–282 which involved a 1966 sale of property directly adjacent to the subject property for $200 an acre. The witness had quite accidentally talked to the seller of that property but that social conversation took place before the witness even knew he was going to testify in this case (Tr. 32–35).

The government's appraisal witness, however, made very clear that he had assumed the 1966 sale of adjacent property was what he called "under the influence of Kaysinger Lake" and was therefore to be disregarded (Tr. 9, 13). Government's exhibit 3 established that sale B–282 was "very similar to the subject tract" but some unidentified person stated his conclusion that the "sale was motivated by Kaysinger Bluff Reservoir." No factual data to support that conclusion was included in government's exhibit 3 nor was any evidence adduced to support that conclusion.

In spite of the fact that government Exhibit 3 purported to be and was introduced in evidence as "additional testimony of the [government's trial] appraiser," the government's witness testified:

Q. Now, these exhibits that the defendant has, 2 through 12, did you prepare these? Were these prepared by you, that is, as far as the data is concerned and the remarks thereof?

A. No sir. I agreed with it but I did not prepare it.

Q. Who put in the words, who made the opinion where it says motivations?

A. I do not know, and I paid no attention to it.

The government's appraisal witness testified about sale B–107 involving property sold in 1963 at $63.89 per acre and a resale of the same property at $100 per acre in 1966. Some unidentified employee of the Corps of Engineers had labeled the 1963 sales as having been "bought for speculation." The government's appraisal witness testified in regard to those two sales as follows:

Q. I am going to show you this and ask if this is the previous sale to it. This shows a sale of April of 1963, is that correct?

A. Yes, sir.

Q. And it shows a sale price of 180 acres at an average price of $63.-80 an acre, is that correct?

A. Yes, sir.

Q. And it shows on that that it was bought—the motivation is "bought for speculation," is that true, sir?

A. I do not know, sir.

THE COURT: Let me see this motivation business.

MR. KATZ: Each one of these has a motivation, Your Honor, on each one of these exhibits. It shows motivation, bought for rural home site, rural residential building site * * *.

THE COURT: Did you say you did not fill this out?

A. No, sir.

THE COURT: Who did?

A. I do not know, sir.

THE COURT: Who formed the judgment that this was bought for speculation?

A. I do not know, sir.

THE COURT: You don't know whether it was bought for speculation or whether it wasn't?

A. No, sir, I paid no attention to that statement that it was bought for speculation. [Tr. 22–23]

Later testimony by the government's appraisal witness established that it was quite accidental that the facts concerning the 1963 sale and 1966 resale of B–107 was ever adduced in evidence. That later testimony further revealed that the witness had not personally verified either of the sales and that "it just happened that those [the 1963 sale and the 1966 resale] are stapled together. I did not intend this original purchase to be in here but it is" (Tr. 24).

The government's appraisal witness' reluctance to concede that those two sales of the same property illustrated the well known general increase in property values in the area (Tr. 24–25) was consistent with his rationalization that the existence of a pond on the subject property would not affect its market value. The pond did not appear on government's exhibit 1 which was an aerial photograph taken in 1959 (Tr. 6, 17). In answer to the question: "Doesn't a pond make it convenient for watering stock?" the witness stated: "It may. It may also create a hazard to the stock, depending on the pond" (Tr. 18). Although the witness testified that he did not remember much about the pond (Tr. 18), he stated that "I don't believe it would make a nickel's difference in the purchase price of it" (Tr. 47). The government's appraisal witness' knowledge about the fencing and other improvements on the property followed the same pattern of lack of knowledge and concern (Tr. 46–47).

One of the most sharply contested issues of fact in this case related to the highest and best use of the property. The government contended and the government's appraisal witness testified that the highest and best use of the property was agricultural (Tr. 40–42). The government's contention was made in the face of the undisputed facts that of the unit of 60 acres of land owned by defendants only 5 acres could be classified as crop land, 1 acre was occupied by the homesite, 14 acres were classified as brushy pasture, and the remaining 40 acres were in brush and timber.

On cross-examination the government's appraisal witness testified:

Q. Well, now, what makes you say the best use of this land is agricultural? None of this 50 acres has ever been under farm land, under crops, is that correct?

A. I couldn't say whether it had or had not. At the time I examined it, there is some open area there that appears it could be plowed. Most of these areas have been plowed if they could be.

Q. Now, we have quite a list of your qualifications in farm management and such. Is it your experience that a 50 acre area is an economical, feasible farm?

A. No, sir.

Q. As a matter of fact, it is a losing proposition on a small acreage, is that not true, generally speaking?

A. For commercial agriculture, yes. For hobby agriculture, who knows.

Q. Well, now, hobby agriculture, if somebody goes down there and wants to put a little farm on there, is that considered hobby agriculture?

A. There are so many variations that I hate to get into this discussion.

Q. Well, we are trying to determine a value of a man's property that is being taken, and you have made a judgment and I take it it is your judgment that the best use of this is agriculture, is that correct?

A. Yes, sir.

Q. Now, I think we ought to define how you determine that the best use of it is agriculture. Now, you obviously—and you show in your report—did you make the analysis as to ten acres being brushy pasture and 40 acres under timber?

A. Yes, sir.

Q. And you are still saying that the best use of this land is agriculture even with that evidence, is that correct?

A. Yes, sir.

Q. And why do you say that?

A. Because I can see no other use for it prior to Kaysinger Bluff Reservoir, and my instructions are that I cannot consider Kaysinger Bluff influence in any appraisal I make of a before value.

The regulation to which we have made reference did not require such totally incredible testimony. Any instructions received from anyone else concerning the influence of the construction of the Kaysinger Dam were obviously misunderstood by or erroneously transmitted to the government's appraisal witness. The government did not attempt to establish that the sale of any particular property had in fact been influenced by the Kaysinger Dam. Nor did it offer any evidence in regard to the general impact of Kaysinger Dam on the general area. Under familiar principles of law the trier of the facts in a condemnation case is not at liberty to speculate about such matters. We would have thought it obvious to the government that the value of land devoted to the use to which the subject property was best adapted and the use for which it was purchased might or might not be affected by the presence of a lake in the general area and that evidence in that regard would be required to establish the government's contention. None was adduced in this case.

We set this matter for further hearing in light of the unsatisfactory state of the government's evidence and in order that more reliable evidence be adduced. The Jefferson City hearing of this case established that defendant's counsel's expectation that he would be able to establish the fair market value of the subject property by cross-examination of the government's appraisal witness had been overly optimistic (Tr. 2).

By agreement, the second hearing was held in Kansas City on November 7, 1968. Defendant Kerrick, to whom the government's appraisal witness had not talked (Tr. 41), made clear at the second hearing why he had purchased the land and the use he and many other people who have purchased small tracts of Ozark property had made of such property long before Kaysinger Dam was conceived by anyone. He testified that he is a tool and die machinist by occupation. He worked initially for Matthews Machine Works and has been employed by Bendix Corporation for the past 19 years. The subject property was purchased by him, with title in his and his wife's name, in 1959 "for retirement purposes." He explained that he and his wife had looked for such a piece of Ozark property for three years. He testified:

We won't have a sufficient income coming in when I retire and my wife is five years younger than I am. We will have to have additional revenue, and we were looking for it ahead of time, at that time, the reason we bought it. [Tr. 52].

During the period of time defendants have owned the subject property the fences were repaired, a well was drilled, a pond was built, and "we put quite a bit of conservation work on it too, from the conservation project," (Tr. 53). Over the years he had purchased some

farm machinery for use in further improvements. The improvements on the subject property were made on "nearly every weekend that we could get off to get down there" (Tr. 53).

Because the present taking leaves only 10 acres of land, defendants have purchased a 24 acre tract in Hickory County for approximately $270 per acre. Mr. Kerrick intends to retire on that tract next year, as he would have retired on the subject tract, and "have some cows, and raise a little feed" (Tr. 53). He apparently was reared on a farm because he has had 25 years experience raising cattle (Tr. 59).

Mr. Kerrick testified that in his opinion his property was worth "easily two hundred" dollars an acre. He was influenced by the fact that he had turned down a $200 offer and because "the adjoining 20 acres was sold unimproved for $200 per acre" in 1966 (Tr. 57).

Mr. Kerrick testified that he knew nothing about that sale at the time it was made, which was sale B–282 discussed earlier, but that he later found out that the seller "was asking $250 an acre, but his wife was in bad shape and she passed away in the hospital and he was forced to sell" (Tr. 57, 59).

## II.

Before discussing the findings of fact and conclusions of law suggested by the parties we rule two oral motions made by the government during the trial. The first was a motion to strike; the second, a motion for directed verdict.

At the close of Mr. Kerrick's cross-examination, he was asked the following questions and gave the following answers:

Q. Now, you have placed a value on your subject property of $200 an acre?

A. Yes, sir.

Q. Do you feel that is a value to you as owner, what it is worth to you as the owner?

A. Yes, I would say that. [Tr. 60].

On direct examination, Mr. Kerrick had testified:

Q. Mr. Kerrick, do you have an opinion as to the value of your property as of the 21st day of March, 1968?

A. Yes, sir.

Q. What is your opinion as to its value? * * *

A. Well, easily worth two hundred.

Q. Two hundred?

A. An acre, yes, sir.

On the basis of the words that government counsel put in the defendant's mouth on cross-examination, the government made what apparently has become a standard motion in the trial of condemnation cases in this district. It moved "to strike that part of Mr. Kerrick's testimony regarding the value of his property at $200 an acre, since this is the value to him as owner, which I believe he just testified to. I don't believe this is competent evidence" (Tr. 60). United States v. Sowards was cited in support of the oral motion to strike. We took that motion with the case. The government's motion for a directed verdict was based on the same rationale; the government contending that "the only valuation testimony presented to the Court that is valid is that of our witness Mr. Clark" (Tr. 61).

The government filed written suggestions in support of its two oral motions. Those suggestions show that both motions are based upon the untenable notion that an owner of property cannot testify as to its value. The case of United States v. Sowards, (10th Cir. 1966), 370 F.2d 87, is once again cited as the sole authority upon which the government relies.

We are no more impressed with the government's reliance on *Sowards* in this case than we were in *Claybank Investment Corporation*, (No. 1280, Tracts 1423 and 1424) which we recently decid-

ed on Demember 10, 1968. In regard to *Sowards*, we stated in *Claybank* that:

United States v. Sowards, (10 Cir. 1966) 370 F.2d 87, involved a question of the value, if any, of 41,000 tons of coal admitted in place on the subject property. Judge Pickett made clear that what he said in regard to the special factual circumstances presented in that case was not to be taken as an implication that "in a proper case the testimony of a property owner may not alone be sufficient to support a verdict." The government does not suggest why that established rule is not applicable to the case at bar.

\* \* \* \* \* \*

In the face of an obvious conflict in testimony in regard to the highest and best use of the subject property, the government's motion contends that the only credible evidence in this case was that adduced by the government expert witness. The cases upon which the government relies do not remotely suggest that the trier of the facts is obligated to accept only the testimony of witnesses called by the government. Nor do those cases sustain the notion that the testimony of the defendant \* \* \* is somehow to be totally disregarded. The government's motion should be and is therefore denied.

The government does not suggest why the established general rule recognized in *Sowards* should not be applied in this case. Its motions to strike and for directed verdict will therefore be denied.

■ The government moved to strike defendants' suggestions when they were filed out of time. The suggestions in support of that motion merely state the obvious fact that the defendants' counsel did not timely file his suggestions. The government does not suggest how that fact could have or did in fact prejudice the government. The government has not filed any response to defendants' suggestions, as it had leave to do (Tr. 66), nor has it indicated that it ever wanted to file any response. While counsel for the defendants unquestiona-

bly should have obtained an extension of time, which we indicated at trial would be granted for good cause shown (Tr. 66), we can find no prejudice to the government which would warrant the radical sanction which the government has made the subject of a formal motion. Its motion will accordingly be denied.

### III.

■ The government's suggested conclusions of law correctly state that the burden of proof is on the defendants and that under the circumstances of this case comparable sales of similar property are the best evidence of value. The other conclusions of law suggested by the government rest on the untenable notion that United States v. Sowards commands a holding that "the defendant presented no evidence upon which a verdict or decision could be based." What we have already said in regard to *Sowards* disposes of that contention.

The government at trial was wedded to the theory that the highest and best use of the property was agricultural. The government, however, refrained from suggesting any finding of fact or conclusion of law to that effect. Such a finding, if made, would be clearly erroneous in light of the undisputed facts concerning the physical condition of the land and the government's own testimony that the subject property could not be considered "an economical, feasible farm" and that anything other than what the government's appraisal witness called "hobby" agriculture (whatever that may mean) would be "a losing proposition on [such] small acreage" (Tr. 44).

The defendants' testimony that he purchased and was in the course of preparing the property as a retirement homesite was undisputed. There can be no legitimate doubt that the subject property was "very similar" and separated only by a fence from the adjacent twenty acre tract which sold in 1966 for $200 per acre.

■ The government suggests that we find that the sale "which adjoins

subject property, cannot be considered as a comparable sale since the existence of the Kaysinger Reservoir influenced the buyer." Such a finding is not supported by the evidence adduced in this case. Even if the government's contention that the highest and best use of the subject property was agricultural was tenable, which it is not in light of the evidence adduced, the testimony of the government's trial appraisal witness would not support a finding that the fair market value of brushy pasture land as of March 21, 1968 in Benton County, Missouri, was only $55 an acre and brush and timberland was only $45 an acre. An exceedingly small handful of the sales in the whole list eventually collected from the government's appraisal witness by defense counsel may be said to even come close to supporting the notion that property values in Benton County were so depressed in the year 1968.

The few sales upon which the government's appraisal witness relied were, for the most part, sales in 1964 and 1965 and were apparently selected from the Corps of Engineers' big book of some 300 sales in the project area, for the purpose of sustaining the deposit appraisal which was made by some unidentified person presumably in the employ of the Corps of Engineers (Tr. 27).

There can, of course, be no doubt that the property values in Benton County, Missouri, increased between the date of those selected sales in 1964 and 1965 and the 1968 date of taking. When confronted with the resale in 1966 of the identical property originally purchased in 1963, which showed an advance from $63.89 an acre to $100.00 an acre, the government's appraisal witness readily agreed that "property values have shown a tendency to increase in this area" (Tr. 25).

The evidence adduced by the government does not approach the commendably high standard set forth in the regulation in regard to "the governmental obligation to serve the general public and to protect the common welfare in such manner as to meet the acid test of severe criticism of methods employed in estimating compensation for the taking of private property for public use."

On the other hand, the evidence adduced by the defendants did not exactly establish a model to be followed in other cases. We recognize, of course, that the defendants' financial resources are limited but counsel for the defendant could have made use of discovery procedures provided in the Rules of Civil Procedure which would have revealed the necessity for relying on something more than the cross-examination of the government's appraisal witness long before that necessity became apparent in this case. See United States v. Meyer, (9th Cir. 1968) 398 F.2d 66, for an authoritative review of the power of the Court to order discovery in a condemnation case. Had appropriate requests for discovery been filed defendants' counsel would have been advised before trial exactly what evidence the government intended to adduce and the rationale, if any, upon which the government's expert witnesses intended to rely when they would take the stand.

While study of the sales in evidence and the general weight of all the evidence establishes that the government's estimate of fair market value is confiscatorily low, the evidence adduced by the defendant does not forcibly suggest that Mr. Kerrick's opinion of the 1968 fair market value of his property was also low. Perhaps a case could have been made that the fair market value of the defendant's land in 1966 was the same as the adjacent property which then sold for $200 an acre and that defendants were therefore entitled to the established appreciation from 1966 to 1968. We are not convinced that defendant carried the burden of proof in that regard.

We are convinced, however, that consideration of all factors in evidence, particularly that which established the highest and best use of the land as a retirement homesite, requires a finding and determination that the fair market value of the subject property was $200 per acre at the time of the

taking and that plaintiff is entitled to judgment on that basis. That finding, of course, rules out any sole reliance upon the 1966 sale of the property which was separated only by a fence from the subject property. We have considered that sale as only one of the many in evidence and have given each sale and all other evidence the weight we believed it deserved. Our finding necessarily is based upon the premise that the fair market value of the subject property in 1966 was less than $200 because the government's appraisal witness conceded, as other evidence in the case established, a general rise in property values for similar property in the area.

The government did not attempt to adduce appropriate evidence concerning its implicit contention in regard to the alleged impact of the Kaysinger Dam. No evidence was adduced to support a finding that the fair market value of retirement homesite property similar to the subject property and similar to the adjacent property would or would not be affected by the Kaysinger Reservoir. Indeed, the government's appraisal witness did not even know how close the subject property was going to be located from the lake (Tr. 31). It would seem obvious that appropriate evidence could have been adduced on that and other related subjects. The fact that the government failed to do so required this Court to make its ultimate finding on the basis of the evidence adduced by both parties as that evidence was corroborated by all other facts and circumstances adduced in evidence.

It is our judgment that the record as a whole supports our finding that, after weighing all the evidence, the fair market value of the subject property was Ten Thousand Dollars at the time of the taking.

It is therefore

Ordered that the government's oral motion to strike Mr. Kerrick's testimony should be and is hereby denied. It is further

Ordered that the government's oral motion for directed verdict should be and is hereby denied. It is further

Ordered that the government's motion to strike the defendants' suggested findings of fact and suggested conclusions of law should be and is hereby denied. It is further

Ordered that an appropriate judgment in the amount of Ten Thousand Dollars ($10,000.00) be entered in favor of the defendants. It is further

Ordered that this memorandum opinion be filed pursuant to Rule 52 of the Federal Rules of Civil Procedure as our findings of fact and conclusions of law.