**UNITED STATES of America,**
**Appellee,**

v.

**Bill Miles SKILLMAN, Appellant.**

**No. 19978.**

United States Court of Appeals,
Eighth Circuit.

April 30, 1971.

Kenneth K. Simon, Kansas City, Mo., for appellant.

Calvin K. Hamilton, First Asst. U. S. Atty., Bert C. Hurn, U. S. Atty., Kansas City, Mo., for appellee.

Before MATTHES, Chief Judge, HEANEY, Circuit Judge, and VAN PELT, Senior District Judge.

VAN PELT, Senior District Judge.

Defendant, Bill Miles Skillman, appeals from a judgment of conviction upon three counts of an indictment charging in separate counts a violation of 18 U. S.C. § 371[1] (conspiracy to receive and dispose of stolen U. S. Postage Stamps) and two violations of 18 U.S.C. § 641[2] (receiving and disposing of U. S. Postage Stamps). The trial judge imposed a sentence of five years on the conspiracy count and separate sentences of seven years upon each of the other two counts, all sentences to run concurrently. We affirm the trial court.

## I— SUFFICIENCY OF THE EVIDENCE

The evidence established two post office burglaries. In the burglary of the Station C Branch in Atlanta, Georgia, on February 20, 21, 1967, there was a shortage of stamps and money of $56,717.18. In the burglary of the Florence, Alabama, post office on March 7 and 8, 1967, there was a shortage in stamps and money of $107,630.42. Included in the stamps stolen was $3500.00 in 30¢ special delivery stamps.

Knight,[3] who had pled guilty, was a principal witness against the defendant. He testified that he and one Bernie Lewis had been involved in several previous burglaries, and that the two men had driven to Atlanta, Georgia, on February 20, 1967, for the purpose of burglarizing the Station C Branch Post Office. He testified to the details of the burglary, which are unimportant to this appeal, and that after the burglary he and Lewis returned to the motel in Chamblee, Georgia, a suburb of Atlanta, where they had checked in previously. There they sorted the articles stolen and placed certain articles in a trunk purchased for that purpose and some green army laundry bags. Knight then called Bob Matthews in Omaha, Nebraska, to discuss

[1]. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000, or imprisoned not more than five years, or both.

"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

[2]. "Whoever embezzles, steals, purloins, or knowingly converts to his use of the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being

made under contract for the United States or any department or agency thereof; or

"Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"The word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."

[3]. Knight entered a plea of guilty to the charges contained in the indictment. It was Knight who informed the government of the identities of those persons who had participated in the burglaries, and the manner in which the stamps were sold.

the sale of the stolen postage stamps. Matthews informed Knight that he had a "drop" south of him (Matthews). Knight advised Matthews he had about $25,000 worth of stolen stamps, and Matthews informed Knight he would see what he could do.

Knight and Lewis started for Omaha. While en route, they again contacted Matthews and were instructed to proceed to Kansas City, Missouri, and advise him when they arrived. Another call was placed from Columbia, Missouri, and Matthews instructed the two men to proceed to Chicago, Illinois, since the party in Kansas City was not in town.[4] Knight and Lewis proceeded on to Chicago and there disposed of some $3500.00 worth of stolen stamps after a call to Matthews. Another call was placed to Matthews, and the two men were again told to proceed on to Kansas City. Upon their arrival, and checking in at a motel, they again placed a call to Matthews who instructed them to wait and that he would get in touch with the party in Kansas City.

Later, Knight again telephoned Matthews, and was instructed to call VIctor 2–1777[5] and ask for "Bill". Knight called the number and defendant answered. After introducing himself, Knight informed defendant a party in Omaha had given him his number, and defendant told him to come to his office, Room 707, Rialto Building, at Ninth and Grand, Kansas City, Missouri. After Knight arrived, he informed defendant he had approximately $50,000 worth of stolen stamps, to which defendant replied that he had been told that there was only $25,000 worth of stamps, and that he wasn't prepared to buy $50,000 worth. Knight replied that when he talked to Matthews he had not completed counting the stamps and had told Matthews he had only $25,000 worth. A sale was consummated on the basis of 20% of the face value of the stamps. Half of

the money was paid at that time and half was to be paid after Skillman and his partner had made a final count.

The stamps were delivered to defendant's office later that day in a footlocker and in green army bags. Skillman had requested that delivery be delayed until everyone was out of the building. Skillman also arranged for Knight to get his car fixed, and Lewis took the car to the Shepherd Motor Company in North Kansas City. The two men then left Kansas City via airplane. Knight returned in a few days and was given the rest of the money due from the sale of the stamps. It was agreed between Knight and defendant at Skillman's office, that before any more stamps were brought to Kansas City, Knight would call defendant in advance and inform him of his impending arrival and the quantity of stamps to be purchased.

Subsequently, on March 7–8, 1967, Knight, Lewis, and one Smith burglarized the Post Office at Florence, Alabama. Knight again contacted Matthews, and was advised to proceed to Kansas City. Upon arriving they checked into a motel, where the stamps were put into two footlockers and green army laundry bags. Knight then telephoned defendant and the three men went to defendant's office where the stamps stolen in the second burglary were purchased by defendant after some negotiation. Late in the afternoon the footlockers and laundry bags containing the stamps were placed in a storage room in the basement of the Rialto Building, the use of which Skillman had obtained from the building manager, where they remained for several days.

Only defendant and the building manager had keys to the storage room. The footlockers eventually disappeared. The building manager found empty green bags in the room. Defendant told the manager he could do anything he wanted

4. Exhibit 9, an airlines ticket, indicates that defendant flew from Kansas City to New Orleans and returned on the day this call was made.

5. The record indicates that this number is one of defendant's office telephone numbers in Kansas City.

with the bags. They were turned over to the postal inspector, and upon examination, it was discovered that they contained perforations or punchouts identical in size and texture to those from genuine United States postage stamps. A portion of a thirty cent special delivery stamp was also found.

Various telephone, motel, credit card, and other records were identified in the stipulations filed in this case which sufficiently corroborate the travel and phone calls of Knight, Lewis, and Smith, as well as the travel and calls of the defendant.

Appellant challenges the sufficiency of the government's evidence to establish a conspiracy. In considering this question, we must view the evidence in the light most favorable to the jury's verdict. United States v. Marttila, 434 F.2d 834 (8th Cir. 1970); United States v. Bennett, 428 F.2d 772 (8th Cir. 1970); United States v. Warner, 428 F.2d 730 (8th Cir. 1970); United States v. Fryer, 419 F.2d 1346 (8th Cir. 1970), cert. denied, 397 U.S. 1055, 90 S.Ct. 1399, 25 L.Ed.2d 672 (1970). We must accept as true and established all reasonable inferences that tend to support the jury's actions and conclusions. United States v. Marttila, *supra*; United States v. Fryer, *supra*; Peterson v. United States, 405 F.2d 102 (8th Cir. 1968), cert. denied, 395 U.S. 938, 89 S.Ct. 2003, 23 L.Ed.2d 453 (1969), rehearing denied, 396 U.S. 870, 90 S.Ct. 43, 24 L.Ed.2d 128 (1969); Cave v. United States, 390 F.2d 58 (8th Cir. 1968), cert. denied, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968); Phelps v. United States, 160 F.2d 858 (8th Cir. 1947), rehearing denied, 161 F.2d 940 (8th Cir. 1947).

■■ The offense of conspiracy consists of an agreement between the conspirators to commit an offense, attended by an act of one or more of the conspirators to effect the object of the conspiracy. United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128 (1940); Kirschbaum v. United States, 407 F.2d 562, 565 (8th Cir. 1969); Cave v. United States, 390 F.2d 58, 69 (8th Cir. 1968), cert. denied, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968). In order to establish a conviction under 18 U.S.C.A. § 371, the government must prove (1) an agreement, (2) a combination of two or more persons, (3) an unlawful purpose, and (4) an overt act committed by one of the conspirators in furtherance of the conspiracy. Cross v. United States, 392 F.2d 360, 362 (8th Cir. 1968).

Recognizing that proof of a conspiracy is seldom, if ever, established by a formal statement of such a conspiracy,[6] defendant asserts there must be some deliberate participation in furtherance of a common goal. Defendant contends that the evidence here establishes at best only a mere sale, and does not sufficiently establish any agreement to support a conspiracy conviction. Defendant relies principally upon United States v. Ford, 324 F.2d 950 (7th Cir. 1963):

> "The relationship of buyer and seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy to sell, receive, barter or dispose of stolen property although both parties know of the stolen character of the goods. In such circumstance, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective." *Id.* at 952.

See also United States v. Varelli, 407 F.2d 735 (7th Cir. 1969).

Taking the evidence in the light most favorable to the jury's verdict, we think there was sufficient evidence to establish more than a mere buyer-seller arrangement. Knight's testimony indicated that he made several calls to Matthews in Omaha, who eventually told Knight to proceed to Kansas City, call defendant's telephone number, and ask for Bill, in order to dispose of the stolen stamps. From this it can be inferred that Matthews and Skillman worked together in the disposition of the stolen

---

6. See Koolish v. United States, 340 F.2d 513, 523–524, (8th Cir. 1965).

stamps, with Matthews acting as a go-between. When Knight told Skillman he had $50,000 worth of stolen stamps, defendant's response was that he had been told only half that amount would be delivered. This testimony, if believed, clearly established a prearranged sale of the stamps, and thus meets the requirements of (1) a prior agreement beyond the mere sale, (2) a combination of at least three persons, (3) an unlawful purpose, and (4) an overt act.

There is another aspect to the charge of conspiracy. Defendant contends that there was but a single transaction which occurred giving rise to both the conspiracy charge and the counts charging a substantive violation, and that the maintenance of a prosecution on these charges, the conspiracy and the substantive offense, was untenable and prejudicial error.

In Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the United States Supreme Court held that the commission of a substantive offense and a conspiracy to commit that offense are two separate and distinct crimes, with certain exceptions:

"There are, of course, instances where a conspiracy charge may not be added to the substantive charge. One is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime. See United States v. Katz, 271 U.S. 354, 355–356 [46 S.Ct. 513, 514, 70 L.Ed. 986]; Gebardi v. United States, 287 U.S. 112, 121–122 [53 S.Ct. 35, 37, 77 L.Ed.2d 206]. Another is where the definition of the substantive offense excludes from punishment for conspiracy one who voluntarily participates in another's crime. Gebardi v. United States, *supra*. But those exceptions are of a limited character. The common law rule that the substantive offense, is a felony, was merged in the conspiracy, has little vitality in this country. It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. The power of Congress to separate the two and to affix to each a different penalty is well established. Clune v. United States, 159 U.S. 590, 594–595 [16 S.Ct. 125, 126, 40 L.Ed. 269]. A conviction for the conspiracy may be had though the substantive offense was completed. See Heike v. United States, 227 U.S. 131, 144 [33 S.Ct. 226, 228, 57 L.Ed. 450]. And the plea of double jeopardy is no defense to a conviction for both offenses. Carter v. McClaughry, 183 U.S. 365, 395 [22 S.Ct. 181, 193, 46 L.Ed. 236]. It is only an identity of offenses which is fatal. See Gavieres v. United States, 220 U.S. 338, 342 [31 S.Ct. 421, 422, 55 L.Ed. 489]. Cf. Freeman v. United States, [6 Cir.] 146 F.2d 978. A conspiracy is a partnership in crime. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253 [60 S.Ct. 811, 858, 84 L.Ed. 1129]. It has ingredients, as well as implications, distinct from the completion of the unlawful project. As stated in United States v. Rabinowich, 238 U.S. 78, 88 [35 S.Ct. 682, 684, 685, 59 L.Ed. 1211]:

'For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered.'

And see Sneed v. United States, [5 Cir.] 298 F. 911, 912–913; Banghart v. United States [4 Cir.], 148 F.2d

521." *Id.* at 643–644, 66 S.Ct. at 1182, (footnotes omitted).

See also Callanan v. United States, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), rehearing denied, 365 U.S. 825, 81 S.Ct. 687, 5 L.Ed.2d 703 (1961); Williams v. United States, 292 F.2d 157 (8th Cir. 1961); Garner v. United States, 277 F.2d 242 (8th Cir. 1960).

Defendant asserts that the cases of Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), have weakened this long-established rule, and that since the conspiracy and substantive offense are included in the same transaction, the government cannot successfully maintain two separate prosecutions. While such an argument is interesting, we consider it to be without merit. Generally, a conspiracy requires different proof of facts than does the substantive offense, and in that manner they do not arise out of precisely the same acts or transaction. Where both the conspiracy and the substantive offense do consist of the same acts or transaction, a conspiracy charge may not be added to the substantive charge. Pinkerton v. United States, *supra.*

The second exception where a conspiracy charge may not be added to the substantive charge as announced in *Pinkerton* has significance in this case. Where the definition of the substantive offense excludes from any punishment a party who participated voluntarily in another's crime, then it is permissible to add a conspiracy to the substantive offense. Here the evidence shows that Matthews was a go-between, acting as the middleman between the sellers and the purchaser. It was Matthews who arranged both meetings, and with whom both Knight and the defendant were in contact. The government relies to a considerable extent on United States v. Smolin, 182 F.2d 782 (2nd Cir. 1950), where the court stated:

"While the crime of receiving and possessing stolen goods necessarily involves the cooperation of the thief and the buyer, it does not necessarily involve the cooperation of the buyer and a go-between * * *." 182 F.2d at 786.

While the instant case is readily distinguishable from *Smolin,* in that there was no evidence that Matthews and Skillman were buyers of the stolen stamps, it is sufficiently analogous to lend support to our holding. We conclude that the evidence establishes more than a mere buyer-seller arrangement, and hold that the evidence adduced on the charge of conspiracy was sufficient.

## II— THE TAPE RECORDING

At the trial Skillman took the stand. He told what he did on February 24, 1967 and denied making any payment to Knight on that date. He said he had no contact with Knight at any time for any purpose and did not have a call from him in March, 1967 relating to merchandise or goods for sale. He said he had no contact with Knight on March 1, 1967 and did not speak to Knight on March 9, 1967. On March 14 he met several people but did not have any contact with Knight.

The foregoing was in response to questions of his own counsel. On cross-examination he again answered that he had never had contact with Knight and had never talked to him and stated that he had never talked to him on the telephone.

It was then that on rebuttal witness Ritchie, a postal inspector, was recalled. He told of the procuring of a telephone call from Knight in Tampa, Florida, to Skillman and to recording the conversation. This recording was then offered for impeachment purposes and played. Parts were unintelligible. It did show sufficient conversation to indicate acquaintance between Knight and Skillman on a first name basis and contact between them.

Skillman on sur-rebuttal testified that his records did reflect this call, that he didn't hear the tape very well "but apparently it was my voice on the other

end. * * * And had not someone directed me to the date of November the 24th, I still would have said I had never talked to Bill Knight. Q. In fact, did you know this Bill Knight at the time that this call was apparently received by you? A. No, and Bill Knight was not impressed upon me until after the indictment."

The court told the jury that the recording and the telephone conversation were admitted solely for such evidentiary value as they might have to rebut Skillman's statement that he never had a telephone conversation with Knight and not for any other purpose.

The receipt of this recording and the evidence relative thereto is assigned as error.

On June 23, 1969, a date well in advance of the trial, Skillman filed a motion entitled "Separate Motion of Bill Miles Skillman to Compel Disclosure of All Evidence Favorable to Defendant" (R. pp. 69–71). We will not prolong this opinion by copying it in full.

On June 26 the court entered an order enumerating the last two of the requests for information, including: "Written or recorded statements, or a summary of any statement made by defendant or copies of such statements." and "The results of reports of any scientific or economic tests or experiments or studies made in connection with the instant case, or copies of those reports." And then ordered in part: "The motion is therefore overruled to that extent, but with respect to the last two requests, if the Government has any such information, it should be made available to the defendant." The government on July 22, 1969 responded "The government advises it does *not* have in its possession any written or recorded statement of * * * any statement made by defendant Bill Miles Skillman."

It is the failure to produce this recording and its subsequent use that is assigned as error, it being claimed that it was entrapment and improper inter-

ception without notifying the party that the conversation was being recorded. It is further claimed that the questions asked the defendant were not sufficiently specific and thereby there was an improper foundation. It is now claimed that there was no compliance with the court's order requiring production of all written and recorded statements. This contention is made for the first time in this appeal. Therefore, it cannot be considered controlling. See Peterson v. United States, 405 F.2d 102, 107–108 (8th Cir. 1968), cert. denied, 395 U.S. 938, 89 S.Ct. 2003, 23 L.Ed.2d 453 (1969), rehearing denied, 396 U.S. 870, 90 S.Ct. 43, 24 L.Ed.2d 128 (1969).

The matter was, however, fully discussed with and by the trial court. When defendant's counsel mentioned that the government had been ordered to produce various lab reports and other reports, the court responded that the tape was not a lab report. Counsel did not pursue this issue any further. At the time of the original order and at the time of the government's response above noted, the United States Attorney was unaware of the existence of the tape recording later used for impeachment.

█ Even if we were to hold this issue cognizable on this appeal, the argument is without merit. The recorded conversation was not a "relevant statement" under the meaning of Rule 16. It was introduced not as a part of the government's case-in-chief, but on rebuttal. *Cf.* Harris v. United States, 400 F.2d 264 (5th Cir. 1968). It was not admitted for its truth, but was admitted solely for the purpose of impeaching Skillman's denial that he had ever talked with Knight. There was nothing in the statement which had any bearing on the substantive crimes charged. See United States v. Garrett, 305 F.Supp. 267 (S.D. N.Y.1969). *Cf.* United States v. Federman, 41 F.R.D. 339 (S.D.N.Y.1969). The substance of the conversation was concededly innocuous, and the court instructed the jury not to consider the

conversation for any purpose other than impeachment.[6(a)]

Defendant relies upon Davis v. United States, 413 F.2d 1226 (5th Cir. 1969), and United States v. Crisona, 416 F.2d 107 (2nd Cir. 1969), cert. denied, De Lyra v. United States, 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970), for the proposition that secretly made tape recordings are discoverable under Rule 16 (a). There is no dispute with this generalized rule. However, the facts surrounding the introduction of the tapes in *Davis*, and in *Crisona*, are readily distinguishable from the case at bar.[7] Even if defendant had properly raised the Rule 16 issue, we conclude that there was no abuse of discretion in admitting competent evidence not previously disclosed under Rule 16(g). See Hansen v. United States, 393 F.2d 763 (8th Cir. 1968), cert. denied, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968).

Defendant alleges further that a proper foundation for introduction of the tape for purposes of impeachment had not been laid, since there was no direction as to time, place, or circumstance of the making of the tape. Defendant denied categorically he had ever engaged in a conversation with Knight, or anyone representing himself to be Knight. The court heard argument and testimony outside the presence of the jury on the objection to foundation and admitted the tape for purposes of impeachment. After expressing a great deal of concern, the court stated that the categorical denial of defendant was sufficient for the limited admission of the tape. The court conceded that its admissibility was a close question.

 Generally speaking, the admissibility of evidence is a question within the discretion of the trial court, and a court of appeals will confine its inquiry to whether there was an abuse of that discretion. DeRosier v. United States, 407 F.2d 959, 961 (8th Cir. 1969) ; Wangrow v. United States, 399 F.2d 106, 115 (8th Cir. 1968), cert. denied, 393 U. S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270

---

**6(a).** Added authority supporting the correctness of the trial court's receiving the conversation for impeachment purposes is found in the case of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, decided Feb. 24, 1971. The *Harris* case holds that a statement inadmissible against a defendant in the prosecution's case in chief because of lack of the procedural safeguards of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 may under the facts of *Harris* be used for impeachment purposes to attack a defendant's credibility.

**7.** In *Davis*, defendant was convicted by a jury for possession of and passing counterfeit federal reserve notes. The government introduced as part of its case-in-chief a tape recording of a conversation between defendant and a government informer in which defendant agreed to sell the counterfeit notes. The conversation was recorded with the informer's knowledge. The court of appeals held that the lower court erred in failing to allow discovery of the tape.

In *Crisona*, defendants were convicted of fraud and conspiracy. They had utilized a foreign corporation owned by one of the defendants to issue real estate financing commitments. The falsified corporation was used as a front for obtaining advance fees from various individuals in exchange for commitments to secure real estate financing. Tape recordings of various conversations were made prior to defendant's arrest, and defendant moved for production which was denied. Only one tape was received in evidence as part of the government's case. On appeal the court held that the tape recordings were discoverable under Rule 16 (a), but that failure to compel disclosure was not reversible error, since defendants were given a transcript of the one which was played for the jury, and none of the others contained any information which could have reasonably been of use to defendant.

It is readily apparent that in both cases the tapes were introduced as part of the government's case-in-chief, and were held discoverable. Here, the tape was introduced as rebuttal evidence only. We are not unmindful of the teachings of Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968), and Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Upon examination, however, we conclude that our holding is not in conflict with the rules therein established.

(1968). This discretion is particularly broad where defendants are charged with conspiracy. Wangrow v. United States, *supra*. See also Spinelli v. United States, 382 F.2d 871 (8th Cir. 1967), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1968); Cotton v. United States, 361 F.2d 673 (8th Cir. 1966); West v. United States, 359 F.2d 50, 55 (8th Cir. 1966), cert. denied, 385 U.S. 867, 87 S.Ct. 131, 17 L.Ed.2d 94 (1966). We conclude that there was no abuse of discretion.

Defendant's next allegation is that the tape recording was garbled and unintelligible in certain respects, thus prejudicing his rights by permitting speculation as to its contents. Had the tape been admitted for its substantive truth, we would conclude that the point is at least arguable.[8] However, as we have earlier pointed out, the tape was not admitted for its contents. The jury was not left to speculate, for they were specifically told to disregard the contents of the tape recording. We hold there was no error.

Defendant also argues that at the time the recorded phone call was made, Knight was acting as a government agent in procuring the call, and that it was procured in derogation of defendant's fourth amendment rights. Defendant relies on Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and

United States v. White, 405 F.2d 838 (7th Cir. 1969), cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969), reversed 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, decided April 5, 1971. *Katz* is readily distinguishable on its facts and is not applicable.[9] *Katz* involved electronic surveillance without the knowledge of any of the participants in the conversation. Here the conversation was recorded with Knight's permission. This same procedure has been upheld by the United States Supreme Court in Lopez v. United States, 373 U.S. 427, 439, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963), where the use of a tape recording to corroborate testimony of a government agent was approved:

> "We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording."

See also Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968); Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); Hemphill v. United States, 392 F.2d 45 (8th Cir. 1968); cert. denied, 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149 (1968). We are not persuaded that the teachings of *Lopez* have been set aside by *Katz*, and therefore reject the holding of the Court of Appeals in United States v. White, supra.[9(a)] Accord, United States v. Kaufer, 406 F.2d 550 (2nd Cir. 1969),

8. However, the fact that certain portions of a tape recording are inaudible does not necessarily render the entire tape inadmissible. That question is addressed to the sound discretion of the trial court. United States v. Weiser, 428 F.2d 932 (2d Cir. 1969); United States v. Carlson, 423 F.2d 431 (9th Cir. 1970).

9. Counsel for defendant conceded on oral argument that *Katz* is not controlling in this case.

9(a). After the submission of this cause, it was concluded to await the opinion of the United States Supreme Court in United States v. White which was to be argued in October, 1970. The opinion was filed April 5, 1971 and is reported

in 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed. 2d 453. A majority of the Court reject and reverse the holding of the Seventh Circuit in *White* and give support to an additional ground for rejection which was not discussed in the body of our opinion. *White* holds, as did Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248, that the case of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, decided December 18, 1967, is not to be applied retroactively to electronic surveillance which occurred prior to December 18, 1967. Mr. Justice Brennan concurred in the result in *White* solely on this ground, citing *Desist, supra*. The electronic surveillance used for rebuttal in *Skillman* for impeachment only related

aff'd 394 U.S. 458, 89 S.Ct. 1223, 22 L. Ed.2d 414 (1969), rehearing denied, 395 U.S. 917, 89 S.Ct. 1741, 23 L.Ed.2d 232 (1969). *Cf.* United States v. Hickman, 426 F.2d 515 (7th Cir. 1970).

 Similarly, Massiah v. United States, *supra,* is not here controlling. The situation in *Massiah* occurred after defendant had been indicted, and was held to have violated his sixth amendment right to counsel, not his fourth amendment rights, as contended by defendant in this case. The statements in *Massiah* were damaging in themselves; here the statements are totally innocuous. We hold defendant was not deprived of his constitutional rights by the introduction of this recording.

 Finally, in regard to the tape recording, defendant asserts the court erred in not ordering production of the tape at the conclusion of either Knight's testimony, or at the conclusion of the direct examination of Postal Inspector Ritchie. He relies upon 18 U.S.C.A. § 3500:

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court

shall order it to be delivered directly to the defendant for his examination and use.

\* \* \* \* \* \*

(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

\* \* \* \* \* \*

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

To this contention there are two answers. First, it is evident that the statute is not applicable in this case since there was no testimony on direct examination either by Knight or by Ritchie relating to this conversation. The substance of the recording in no way dealt with the subject matter of their testimony, nor did it pertain to the substantive offense charged. Second, the tape recording was not a § 3500 statement within the meaning of the statute. In United States v. Sopher, 362 F.2d 523 (7th Cir. 1966), cert. denied, 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210 (1966), the court precisely explained what is meant by a § 3500 statement:

"A § 3500 statement is a recorded recital of past occurrences made by a prospective prosecution witness. From its very nature, necessarily it is made after those events have taken place. If a prosecutor, in reliance on the statement, uses as a witness the maker thereof as a part of the government's case, the statement must be produced for the use of defense counsel. But a concurrent tape recording of a conversation between the payer and the recipient of an alleged cash bribe is obviously of contemporaneous sounds. The result is a preservation of

to a conversation which took place on November 24, 1967. For all of these additional reasons we are satisfied with the

soundness of our original rejection of *White.*

a conversation just as it was spoken. It is direct evidence relevant on the the issue of the alleged guilt of the defendants on trial. Made when the allegedly extorted bribe money was being paid, the tape recording in this case is of the actual voices of the briber and the bribee. It is therefore *not a recital of a past occurrence by a prospective witness* and is not within the general purview of § 3500." *Id.* at 525. (Emphasis in original)

Neither Davis v. United States, *supra,* nor United States v. Crisona, *supra,* are helpful to defendant. We conclude there was no error in failing to order production of the tape under § 3500.[10]

## III— SEVERANCE

Defendant next contends the court erred in failing to grant his motion for severance. Specifically, defendant contends that because of defendant Lewis' criminal record the jury was unable to heed the court's cautionary remarks and defendant was prejudiced thereby; the court limited the conspiracy solely to the first burglary; and defendant Skillman was not charged in Count IV. Failure to grant the motion, in light of these developments, it is contended was prejudicial. We disagree.

The conspiracy count charged Matthews, Skillman, Lewis, Knight, and Smith as codefendants, and covered a series of events occurring from February 20, 1967, to December 8, 1967, relating to both the Atlanta and Florence burglaries. Counts II and III charged Matthews, Knight, Skillman, and Lewis with the purchase and sale of stamps stolen from the Atlanta burglary, and Counts V and VI charged Skillman, Smith, Knight, and Lewis with the purchase and sale of stamps stolen from the Florence burglary. Count IV related to the transportation of the stamps from Florence, Alabama, and charged only Lewis, Knight,

and Smith. Counts II, IV and V were dismissed at the close of the evidence.

Rule 8(a) and (b), Fed.R.Crim.P. provides:

"(a) *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

In United States v. McKuin, 434 F.2d 391 (8th Cir. 1970), this court said that "under Rule 8(a), Fed.R.Crim.P., joinder of offenses is ordinarily appropriate where, as here, the specific counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count of necessity overlaps. Furthermore, under Rule 14, Fed.R.Crim.P., it is well settled that the trial court has a wide range of discretion in granting separate trials on different offenses and for different defendants, and in order to secure a reversal it must be affirmatively shown that prejudice resulted from the failure to grant separate trials. Fisher v. United States, 324 F.2d 775, 780–781 (8th Cir. 1963). To the same effect, see United States v. Christian, 427 F.2d 1299 (8th Cir. 1970), *Cf.* Gresham v.

---

10. In any event, there was other evidence corroborating Knight's testimony that he had conversed with defendant on the telephone other than the tape recording. We are thus hard pressed to find that admission of the tape constituted prejudicial error.

United States, 374 F.2d 389, 390 (8th Cir. 1967)."

See also Johnson v. United States, 356 F.2d 680, 682 (8th Cir. 1966), cert. denied, 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed. 2d 84 (1966).

The conspiracy count provides the connecting link for joining both the offenses as well as the defendants. The rule should not be interpreted in a technical sense. 8 J. Moore, Federal Practice, ¶ 8.05 [1], at 8-19 (2d ed. 1968). In Tillman v. United States, 406 F.2d 930 (5th Cir. 1969), vacated on other grounds, 395 U. S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969), the court there succinctly analyzed the scope of inquiry under Rule 8. Because we think the rules announced therein have considerable significance here, we quote at length:

"Where, as here, the offenses arose out of a series of connected acts, trial convenience dictates 'that the government should not be made to prove the same facts more than once.' * * * 8 Moore, Federal Practice ¶ 8.05 [2], p. 8-19 (2d ed. 1968). See Johnson v. United States, 8 Cir., 1966, 356 F.2d 680, 682. Thus, there was no misjoinder of offenses in the present case.

"Similarly, there was no misjoinder of defendants.

* * * * * *

In conjunction with a Rule 8(a) joinder of offenses, Rule 8(b) has the effect of permitting joinder of defendants where their alleged violations of law have arisen out of the same act or series of acts. 8 Moore, Federal Practice ¶ 8.06 [1], p. 8-23 (2d ed. 1968), citing United States v. Granello, 2 Cir., 1966, 365 F.2d 990, 993; Cupo v. United States, 1966, 123 U.S.App.D.C. 324, 359 F.2d 990; King v. United States, 1 Cir., 1966, 355 F.2d 700, 704-705; Ingram v. United States, 4 Cir., 1959, 272 F.2d 567.

* * * * * *

"Having found that there was no misjoinder of offenses or defendants under Rule 8, it is still necessary to determine whether there was sufficient prejudice to require a severance under Rule 14 of the Federal Rules of Criminal Procedure. Smith v. United States, 5 Cir., 1966, 357 F.2d 486, 489; Bayless v. United States, 9 Cir., 1967, 381 F.2d 67, 72; Brown v. United States, 1967, 126 U.S.App.D.C. 134, 375 F.2d 310, 315. See 8 Moore, Federal Practice ¶ 14.02 [1] (2d ed. 1968). Rule 14 states, in relevant part, that

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.'

The existence of prejudice, in large measure, depends upon the facts and circumstances of each case, Flores v. United States, 5 Cir., 1967, 379 F.2d 905, 909; Blachly v. United States, 5 Cir., 1967, 380 F.2d 665, 675; Peterson v. United States, 5 Cir., 1965, 344 F.2d 419, 422, and it is axiomatic that the granting of a severance is within the discretion of the trial judge. Smith v. United States, 5 Cir., 1967, 385 F.2d 34, 37. The burden of demonstrating prejudice is a difficult one, and ruling of the trial judge will rarely be disturbed on review. 8 Moore, Federal Practice ¶ 14.02 [1], p. 14-3 (2d ed. 1968). The defendant must show something more than the fact that 'a separate trial might offer him a better chance of acquittal.' Id. at ¶ 14.04 [1], pp. 14-10—14-11, citing Spencer v. Texas, 385 U.S. 554, 87 S. Ct. 648, 17 L.Ed.2d 606 (1967); Robinson v. United States, 1954, 93 U.S. App.D.C. 347, 210 F.2d 29. See also Johnson v. United States, 8 Cir., 1966, 356 F.2d 680; Butler v. United States, 8 Cir., 1963, 317 F.2d 249; Smith v. United States, 1950, 86 U.S.App.D.C. 195, 180 F.2d 775."

See also Peterson v. United States, 405 F.2d 102 (8th Cir. 1969), cert. denied, 395 U.S. 938, 89 S.Ct. 2003, 23 L.Ed.2d

453 (1969), rehearing denied, 396 U.S. 870, 90 S.Ct. 43, 24 L.Ed.2d 128 (1969); Johnson v. United States, 356 F.2d 680 (8th Cir. 1966); cert. denied, 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84 (1966); Butler v. United States, 317 F.2d 249 (8th Cir. 1963), cert. denied, Benedec v. United States, 375 U.S. 836, 84 S.Ct. 67, 11 L.Ed.2d 65 (1963).

■ We conclude that joinder of offenses and of defendants was proper in this case. Only two of the defendants were involved in the trial of this case, and each had their own attorney. Defendant Lewis did not testify, and thus his criminal record was not before the jury. The court carefully instructed the jury as to what it must find in order to separately convict each defendant. Although defendant was not charged in Count IV, we are unable to discern how he was prejudiced by the joinder of that Count. It is not required that all defendants be charged in each count. United States v. Godel, 361 F.2d 21 (4th Cir. 1966), cert. denied, 385 U.S. 838, 87 S.Ct. 87, 17 L.Ed.2d 72 (1966). In any event, Count IV was dismissed along with Counts II and V. We hold there was no error.

## IV— DELAY BETWEEN OFFENSE AND INDICTMENT

■ Defendant contends the court erred in failing to dismiss the indictment for undue delay between the commission of the offense and the filing of the indictment, based on the fact that a lapse of nine months occurred. Defendant contends he was prejudiced by the delay in that one of his key witnesses died during this period. This issue was first raised by defendant in his motion for new trial, and as such is not now cognizable on this appeal. Peterson v. United States, *supra*. Assuming arguendo that it were properly before us, the contention is without merit. So long as the applicable statute of limitations is observed, delay of indictment, without more, does not constitute a denial of due process. *See* United States v. Snyder, 429 F.2d 1242 (9th Cir. 1970); Whatley

v. United States, 428 F.2d 806 (5th Cir. 1970); McGregor v. United States, 422 F.2d 925 (5th Cir. 1970); United States v. McCarthy, 422 F.2d 160 (2nd Cir. 1970), petition for cert. dismissed, 398 U.S. 946, 90 S.Ct. 1864, 26 L.Ed.2d 286 (1970); Terlikowski v. United States, 379 F.2d 501 (8th Cir. 1967), cert. denied, 389 U.S. 1008, 88 S.Ct. 569, 19 L.Ed.2d 604 (1968).

■ It is settled law in this circuit that the Sixth Amendment applies only from the date of commencement of the criminal prosecution. There is here no evidence of intention of vexatious delay on the part of the government. Terlikowski v. United States, supra (Cir. 1967).

■ The contention that defendant was prejudiced by the death of a principal witness for his case must be rejected, for the record indicates that this witness died before the government learned from Knight who had committed the burglaries, and the manner in which the stolen stamps were sold. Further, there is no indication as to what this witness would have said. The actual delay between the time the government learned of defendant's identity and his participation in the crimes and the indictment was only a period of seven months. In light of the proof adduced at trial, and the complicated nature of the case we hold the delay was not prejudicial to defendant.

## V— SPEEDY TRIAL

Defendant also asserts he was denied the right to a speedy trial, alleging he was indicted on December 8, 1967, and was not tried until August 18, 1969, some twenty months later. In Hodges v. United States, 408 F.2d 543, 549 (8th Cir. 1969), this court, quoting from United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), stated:

"(1) 'We cannot agree that the passage of 19 months between the original arrests and the hearings on the later indictments itself demonstrates a violation of the Sixth Amendment's guarantee of a speedy trial.' (2) The guar-

antee 'is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern .accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself.' (3) However, 'the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.' (4) Then, quoting from earlier cases, 'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.' 'Whether delay in completing a prosecution * * * amounts to an unconstitutional deprivation of rights depends upon the circumstances. * * * The delay must not be purposeful or oppressive.' '[T]he essential ingredient is orderly expedition and not more speed.' "

See also, Whitlock v. United States, 429 F.2d 942, 945–946 (10th Cir. 1970).

 The passage of some twenty months in this case does not, in and of itself, demonstrate a denial of the right to a speedy trial. The first safeguard, the prevention of undue harassment and incarceration prior to trial, and the second safeguard, to minimize anxiety and concern accompanying public accusation, have not been raised by this record. The third safeguard, limiting the possibilities that a long delay will prejudice the accused's ability to defend himself, has no merit. No mention is made of the evidence lost by the lapse of time. The death of one of the proposed defense witnesses has already been discussed. The allegation that defendant was deprived of Matthews' testimony deserves little comment in light of the fact that his deposition was secured before trial. Nowhere is an offer made as to the contents of that deposition. The record indicates that the prosecution requested an earlier

trial, and that the only delay occasioned by the prosecution resulted from an injury to the prosecuting attorney. Defendant filed numerous motions during this time period, and his only motion to dismiss for lack of a speedy trial was filed four days before the trial began. The trial took place within the pertinent statutory time limit. Under all the circumstances, we hold there was no unreasonable delay which deprived defendant of his constitutional rights.

## VII— THE COURT'S CHARGE

. Defendant contends the court erred in its charge to the jury in two significant respects. First, defendant points to the statements by the court referring to the incident as a robbery of post offices or banks when the evidence established a post office burglary. Second, the court allegedly coerced a verdict by implying in its main charge that a verdict of acquittal or conviction must be returned by the jury.

 (1) The court referred several times in its final charge to the offense of a "robbery", and since the evidence establishes a burglary, defendant contends there was a fatal error. This contention is without merit. It is axiomatic that instructions must be read as a whole, and words or phrases cannot be read in isolation. Goings v. United States, 393 F.2d 884, 885 (8th Cir. 1968), cert. denied 393 U.S. 883, 89 S.Ct. 191, 21 L.Ed.2d 158 (1968). The indictment was read to the jury, which in Count I includes a detailed description of the overt acts charged. The evidence adduced at trial clearly established a burglary. The jury was fully aware of the charges against the defendant. The court carefully outlined each offense for them, and corrected itself when the error was brought to its attention. This court has previously been confronted with the analogous contentions and has rejected them. *See e. g.,* Theriault v. United States, 401 F.2d 79 (8th Cir. 1968), cert. denied, 393 U.S. 1100, 89 S.Ct. 898, 21 L.Ed.2d 792 (1968); Beatrice Foods Co. v. United States, 312 F.2d 29 (8th Cir. 1963), cert.

denied, 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199 (1963). We hold there was no error.

(2) Defendant next contends that the district court, in effect, coerced a verdict by advising the jury in its main charge that unanimity was required, and explaining the effect of a guilty verdict and a not guilty verdict, leaving untouched the third alternative of a hung jury. Defendant urges this court to adopt the rationale of United States v. Fioravanti, 412 F.2d 407, 420 (3rd Cir. 1969), cert. denied, 396 U.S. 837, 90 S.Ct. 97, 24 L. Ed.2d 88 (1969), where the Court of Appeals for the Third Circuit announced the *Allen* charge would no longer be accepted.[11] We decline to do so.

This court in Hodges v. United States, 408 F.2d 543 (8th Cir. 1969), considered the question of whether the *Allen* charge was still valid. In answering that question in the affirmative, Judge (now Mr. Justice) Blackmun, stated:

"We initially reject the claim that the Allen charge itself must be held today, some 70 years after the decision, to be coercive, prejudicial, and unconstitutional. The Supreme Court has not yet seen fit to disavow it and, so

long as it stands approved in decided Supreme Court cases, we are not to resolve that issue contrarily.

"Attack upon charges of the Allen type, however, are increasingly frequent. This court has encountered them. In a number of cases the challenged instruction has been upheld. Examples are Bowen v. United States, 153 F.2d 747, 751 (8 Cir. 1946), cert. denied, 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611; Costello v. United States, 255 F.2d 389, 398 (8 Cir. 1958), cert. denied [Cannella v. United States], 358 U.S. 830, 79 S.Ct. 51, 3 L.Ed.2d 69; Janko v. United States, 281 F. 2d 156, 167–168, and cases cited in n. 17 (8 Cir. 1960), rev'd on other grounds, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846; Holdridge v. United States, 282 F.2d 302, 311 (8 Cir. 1960)." *Id.* at 552.

In Hodges, the court was confronted with a supplemental charge to the jury.[12] In the instant case, the language complained of was given in the court's main charge.[13] The American Bar Association has approved such a procedure:

"For the reasons set forth in the Commentary to section 5.4(b), *infra*,

---

11. The charge delivered in the court's main instruction in *Fioravanti*, and objected to by the Court of Appeals for the Third Circuit is markedly different from the charge given in this case:

"Now, members of the jury, I respectfully tell you it is necessary for the purpose of finding a verdict that all of you agree upon that verdict. In other words, when I say the verdict has to be unanimous, it has to be twelve to nothing.

"It is your duty, however, to agree, if possible. When conferring with each other, you should pay a proper respect to each other's opinions and examine such differences in a spirit of fairness and candor. This does not mean any member of the jury shall yield his well-grounded opinions or violate his oath. It does mean he shall not stand out in an unruly and obstinate way through mere stubbornness. Members of the jury should always closely scrutinize the facts from their own standpoint and the viewpoint also of the fellow-members of the jury.

"While undoubtedly the verdict of a jury should represent the opinion of each individual juror, it by no means follows opinions may not be changed by conferences in the jury-room. The very object of a jury system is to secure unity by a comparison of these views. *The jury should listen with deference to arguments of fellow-jurors and distrust of his own judgment if he finds a large majority of the jury taking a different view of the case from that what he does, himself.*" 412 F.2d 414–415 (emphasis in original).

Compare this instruction with the one given in the instant case, note 13, *infra*.

12. The charge given in *Hodges* is set out at 408 F.2d at 553–554, n. 4.

13. "Now, members of the jury, it requires all twelve of your number agreeing to return a verdict. * * * You should make every possible effort to arrive at a verdict of some kind, whatever you decide it to be. You should consider the evidence, consider the opinions of each other. It is never quite possible to attain per-

the Advisory Committee has concluded that the instruction commonly referred to as the *Allen* charge or 'dynamite charge,' should not be given to a jury which has been unable to agree after some deliberations. Nonetheless, it is most appropriate for the court to instruct the jury initially as to the nature of its duties in the course of deliberations, and section 5.4(a) so provides. The standard does not require the use of any particular language, but does identify the five points on which the jury might properly be advised.

"Illustrative of an instruction consistent with section 5.4(a) is Instruction 8.11 of Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 97–98 (1961), which reads:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

Because the instruction contemplated in section 5.4(a) is to be given prior to the time the jury has retired (and thus prior to the time a minority has been established to exist), and because it makes no reference to the minority but instead charges all jurors to consult with one another, the proposed instruction does not have the coercive impact of the *Allen* charge. See Burroughs v. United States, 365 F.2d 431 (10th Cir. 1966), recommending the practice provided for in section 5.4 (a)." Advisory Committee on the Criminal Trial, ABA Project on Mini-

---

fection, and it is the duty of a jury—I have never asked any juror and I never shall, to sign a verdict that is against his or her conscience. But I do say to you that it is the duty of the jurors to attempt to arrive at a verdict, if it is possible to do so, with understanding among each other. It is the only way we have of trying cases of this kind. If one jury can not decide it, another jury of the same kind from the same area will have to be called to pass on the case, so every possible effort consistent with your conscience and consistent with your oath should be made to arrive at a verdict."
In discussing a similar aspect of the charge in *Hodges*, the court observed, at 554:
"Of course, one may argue that, technically, it is not correct for the court to say that 'the case must sometime be decided' or that 'some other jury will have to be brought back', see United States v. Harris, supra, 391 F.2d [348] at 355 [6 Cir.], rather than 'disposed of sometimes', see W. Mathes and E. Devitt, Federal Jury Practice and Instructions, § 15.16

(1965). Further, a reference to the expense of trial is not everywhere approved. See United States v. Smith, 303 F.2d 341, 343 (4 Cir. 1962). We feel, however, that the references of this kind which were employed here are, realistically, of small consequence. It is obvious to a jury that a lawsuit is costly and time consuming. It is also obvious to a jury that, if it is unable to arrive at a verdict, the case does not fade away but remains for decision or other disposition. Judge Burger in Fulwood v. United States, supra, [125 U.S.App.D.C. 183] 369 F.2d [960] at 963, most pertinently observed:
'The statement that some other jury would have to decide the case if this one could not was accurate as a generality and, in any event, could have had no coercive impact on the jury. If they already knew what would likely happen if they deadlocked, it was surplusage; if they did not know, this information, far from being coercive, would have had the effect of reducing the pressure on them to reach a verdict.' "

mum Standards for Criminal Justice, Standards Relating to Trial by Jury— Tentative Draft at 146–47 (1968).

 The Court of Appeals for the Tenth Circuit has also suggested that the substance of the charge be included in the original instructions. United States v. Wynn, 415 F.2d 135, 137 (10th Cir. 1969), cert. denied, 397 U.S. 994, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970). We conclude that such a procedure is appropriate and not prejudicial to the rights of the defendant. Indeed, the charge given in this case in the main instruction was much less coercive than that given and approved in *Hodges.* The objection to such a charge raised in *Fioravanti,* that a court should not direct a juror to distrust his own judgment and reexamine his opinion in light of the majority opinion of the other jurors is not applicable here because Judge Duncan did not so instruct. The charge given is very similar to that approved by the court in *Fioravanti* and by the American Bar Association. We hold there was no error.

## VII— DENIAL OF PSYCHIATRIC EXAMINATION

Defendant's final contention is that the lower court erred in denying his pre-trial motion for psychiatric examination of the government's chief witness, Knight, on the ground that there was and is some question as to Knight's competency. Defendant points specifically to evidence indicating Knight was addicted to narcotic drugs, and had been involved in numerous criminal activities during his life.

 Competence of a witness is, as a general rule, a matter to be decided in the sound discretion of the trial judge. United States v. Hicks, 389 F.2d 49 (3rd Cir. 1968), cert. denied, 391 U.S. 970, 88 S.Ct. 2046, 20 L.Ed.2d 885 (1968), and cases cited. This court will not interfere unless there has been an abuse of that discretion. We have examined Knight's testimony, and it demonstrates that he was responsive, clear, and intelligent in his answers. In addition, the court properly cautioned the jury as to Knight's participation in the conspiracy and burglary.[14] We hold there was no error.

## VIII— CONCLUSION

After careful examination of this detailed record, and analysis of the arguments presented on behalf of defendant, we conclude there was no error. The judgment of conviction is affirmed.

14. "Now, there is also in this case an accomplice. The Government's principal witness in this case was Knight. Knight was a defendant in this case but he has not—has entered a plea of guilty, as the record shows, and he is not here for trial. An accomplice is one who unites with another person or persons in the commission of a crime voluntarily and with common consent. The testimony of an accomplice is competent evidence and the credibility of such an accomplice is for the jury to pass upon as they pass upon the credibility of any other witness. The testimony of an accomplice must be received with great caution, but if the testimony carries conviction and the jury are convinced of its truth, they should give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense. While it is a rule of law that a person accused of a crime may be convicted upon the uncorroborated testimony of an accomplice, still a jury should always act upon such testimony with great care and caution and subject it to careful examination in light of all the other evidence in the case; and the jury ought not to convict upon such testimony alone unless after a careful examination of such testimony, they are satisfied beyond a reasonable doubt of its truth and that they can safely rely upon it."